*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0397p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THOMAS KOVACH et al.,
               *Plaintiffs-Appellants,*

    *v.*

ZURICH AMERICAN INSURANCE COMPANY,
               *Defendant-Appellee.*

No. 08-4512

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 07-02584—Christopher A. Boyko, District Judge.

Argued: July 28, 2009

Decided and Filed: November 13, 2009

Before: GILMAN and McKEAGUE, Circuit Judges; SARGUS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Matthew D. Greenwell, CHARLES V. LONGO CO., L.P.A., Beachwood, Ohio, for Appellant. Rebecca B. Jacobs, ULMER & BERNE LLP, Columbus, Ohio, for Appellees. **ON BRIEF:** Matthew D. Greenwell, CHARLES V. LONGO CO., L.P.A., Beachwood, Ohio, for Appellant. Rebecca B. Jacobs, ULMER & BERNE LLP, Columbus, Ohio, Richard D. Sweebe, Patricia A. Shlonsky, ULMER & BERNE LLP, Cleveland, Ohio, for Appellees.

    GILMAN, J., delivered the opinion of the court, in which SARGUS, D. J., joined. McKEAGUE, J. (pp. 25-37), delivered a separate dissenting opinion.

---

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.   On November 7, 2005, Thomas Kovach was riding his motorcycle while intoxicated, ran a stop sign, and collided with another vehicle in the intersection.   He sustained severe injuries that led to the amputation of his left leg below the knee.  Mr. Kovach was insured under an accidental death and dismemberment (AD&D) insurance policy provided by his wife's employer (hereafter referred to as the Plan).   He and his wife Rebecca filed a claim with Zurich American Insurance Company, the administrator of the Plan, for dismemberment benefits.   Zurich denied the Kovaches' claim after determining that Mr. Kovach's injuries were caused by his drunk driving and therefore not covered as an "accidental" occurrence under the Plan.

The Kovaches brought a claim under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 (ERISA), that challenged Zurich's denial of coverage. Applying a deferential arbitrary-and-capricious standard, the district court granted summary judgment in favor of Zurich.   On appeal, the Kovaches argue that (1) the district court should have applied a de novo standard of review because Zurich improperly delegated its decisionmaking authority to an outside lawyer, and (2) Zurich's denial of their claim was improper under either standard.   Although we reject the Kovaches' first argument, we agree with their second.   We therefore **REVERSE** the judgment of the district court and **REMAND** the case for the entry of a judgment in favor of the Kovaches.

## I. BACKGROUND

**A.       The AD&D policy**

Rebecca Kovach enrolled in the Plan through her employer, KeyCorp.  Zurich, as the Plan Administrator, was responsible for the processing and payment of claims under the Plan and was the claims fiduciary.  The AD&D coverage paid benefits for losses, including dismemberment, resulting from an injury according to the following definition:

> Injury means a bodily injury directly caused by accidental means which is independent of all other causes, results from a Hazard, and occurs while the Covered Person is insured under this Policy.

Although the term "accidental" is not defined, the Plan includes several explicit exclusions, including the following:

> A loss shall not be a Covered Loss if it is caused by, contributed to, or resulted from:
>
> 1.       Suicide, attempted suicide, or a purposeful self-inflicted wound;
> . . .
>
> 7.       Skydiving, parasailing, hangglinding [sic], bungee-jumping, or any similar activity . . . .

Mrs. Kovach's policy provided for up to $250,000 of coverage.  In the case of an amputated limb, the policy paid $125,000.  Mr. Kovach was covered under his wife's policy.

**B.       Mr. Kovach's accident and resulting amputation**

On November 7, 2005, Mr. Kovach was involved in a collision while riding his motorcycle in Ravenna, Ohio.  According to the crash report filed by the responding officer, Mr. Kovach ran a stop sign at a four-way intersection and was struck by a car.  Mr. Kovach was taken to Robinson Memorial Hospital in Portage County to be stabilized.  Based on the severity of his injuries, he was then flown via Medivac

helicopter to the Cleveland MetroHealth Medical Center. The doctors were unable to save Mr. Kovach's left leg, which they amputated just below the knee.

Mr. Kovach's admission report from MetroHealth noted that a blood sample taken at Robinson Memorial Hospital after the accident and tested by an outside lab showed that Mr. Kovach had a blood alcohol content (BAC) of .148%—well over the legal limit in Ohio of .08%. *See* O.R.C. § 4511.19(A)(1). MetroHealth took its own sample of Mr. Kovach's blood sometime after his arrival. Those results showed a BAC of .085% and also showed the presence of opiates and benzodiazepines. The Kovaches contend that the positive drug test was due to medically administered valium and morphine given to Mr. Kovach after the accident, a contention not refuted by the record.

**C.     Zurich's denial of the Kovaches' AD&D claim**

Mr. Kovach and his wife timely filed a dismemberment claim with Zurich in December 2005. The claim was based on Mr. Kovach's below-the-knee amputation. Zurich subsequently retained the services of CS Claims Group, Inc., an independent investigation firm, to obtain Mr. Kovach's hospital and toxicology records, as well as the records from all of his treating physicians. Upon receiving the MetroHealth records and noting Mr. Kovach's BAC, Zurich decreased its reserves on the claim from $125,000 to $10 in anticipation that the claim would be denied. Zurich then hired an attorney, Daniel Maguire, to review Mr. Kovach's file and to draft a denial letter based on the policy's provisions if Maguire agreed that the claim should be denied. The insurer's letter to Maguire noted that Mr. Kovach "was the operator of a motorcycle that appears to have run a stop sign and hit another vehicle in the intersection . . . [and] was intoxicated at the time of loss."

Maguire agreed with Zurich's inclination that the claim should be denied and prepared an opinion letter that discussed the applicable caselaw, concluding that no benefits were payable. Zurich subsequently authorized a denial of the benefits. It sent a denial letter to the Kovaches in March 2006 using language taken from Maguire's opinion letter. The denial letter explained that Zurich had concluded that Mr. Kovach's

injury was not due to an "accident" under the terms of the Plan because Mr. Kovach (a) was driving with almost twice the legal BAC, (b) had tested positive for opiates and benzodiazepines, and (c) had, according to the police officer responding to the accident, run a stop sign and thereby initiated the crash. Zurich thus reasoned that the injury was a reasonably foreseeable consequence of driving while under the influence of alcohol and possibly drugs. Citing several federal decisions upholding the denial of AD&D benefits under allegedly similar circumstances, Zurich also concluded that the facts supported the application of the policy's self-inflicted-wound exclusion.

The Kovaches timely appealed Zurich's initial denial of the claim to the insurer's ERISA Review Committee. They submitted what they characterized as "newly discovered relevant evidence" in the form of Mr. Kovach's affidavit, which asserted that the other driver, not he, ran the stop sign. Zurich responded by clarifying that the Kovaches were not presenting newly discovered evidence, but rather a different version of the events surrounding the incident. Zurich nevertheless noted that it had decided to stay the appeal in order to clarify the issue of which party was at fault for the collision.

To investigate the fault issue, Zurich again retained CS Claims Group, Inc. to obtain the Ravenna Police Department's final Traffic Crash Report. The report confirmed that Kovach had been cited for a stop-sign violation and had tested positive for drugs (based on the MetroHealth test results). Zurich had previously seen only the initial accident report, which lacked these details. After reviewing this information, Zurich's ERISA Review Committee informed the Kovaches' counsel that it had affirmed the denial of benefits.

**D.      The lawsuit**

The Kovaches filed a complaint in the United States District Court for the Northern District of Ohio in August 2007. They named both Zurich and Mrs. Kovach's employer, KeyCorp, as defendants. KeyCorp was dismissed as a defendant shortly thereafter. The parties subsequently filed cross-motions for judgment based upon the administrative record. In September 2008, the district court issued an order upholding Zurich's denial of benefits. The Kovaches have timely appealed that order.

## II. ANALYSIS

### A.      Standard of review

We review de novo the district court's disposition of an ERISA action based upon the administrative record, and apply the same legal standard as the district court. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998). As discussed in Part II.B. below, the district court in this case appropriately reviewed the Kovaches' suit under the arbitrary-and- capricious standard because the Plan granted discretionary authority to Zurich as the plan administrator to interpret the Plan's terms and to determine its benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989) (establishing the arbitrary-and-capricious standard of review in ERISA cases where the plan administrator has discretionary authority); *Glenn v. Metro. Life. Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006) (applying *Firestone*'s standard of review).

Under the arbitrary-and-capricious standard, we must uphold the administrator's decision "if [the administrator's] interpretation of the Plan's provisions is 'reasonable.'" *Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 300 (6th Cir. 2006) (citing *Firestone*, 489 U.S. at 111). But the arbitrary and capricious standard is not a "rubber stamp [of] the administrator's decision." *Glenn*, 461 F.3d at 661. Rather, it requires us to review "the quality and quantity of the . . . evidence and the opinions on both sides of the issues." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003).

### B.      Zurich's retention of Maguire does not alter the applicable standard of review

The parties agree that the Plan gives Zurich discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. As noted above, this vesting of discretionary authority in Zurich would typically lead us to apply an arbitrary-and-capricious standard of review. But the Kovaches argue that, even where a plan vests the administrator with discretion, a de novo review of claim determinations is required if an entity or person other than the one authorized by the plan renders the decision. *See Sanford v. Harvard Indus.*, 262 F.3d 590, 597 (6th Cir. 2001) (holding that where "an unauthorized body that does not have fiduciary discretion to determine benefits

eligibility renders such a decision," arbitrary-and-capricious review is "not warranted"). The Kovaches contend that de novo review should apply in this case because Zurich improperly delegated its discretionary authority to construe the Plan and determine coverage to Maguire, an outside attorney who was not authorized by the Plan to act in such a fiduciary capacity.

The district court properly rejected this argument. Nothing in the record indicates that Zurich in fact delegated to Maguire its authority to construe the Plan or make a determination of whether to pay the Kovaches' claim. Zurich initially set aside $125,000 of reserves for the claim, the full amount that the Kovaches would have been entitled to if their claim had been allowed. But after Zurich received Mr. Kovach's medical and toxicology records, it reduced the reserves to $10 because "this matter may be a potential denial." Zurich's letter to Maguire seeking a legal opinion stated: "[E]nclosed please find copy of [the] file for your review and if in agreement, the drafting of the denial based on policy provisions." After receiving Maguire's opinion letter, Patricia Lane of Zurich communicated to the claims specialist assigned to the claim: "You have my authority to deny the claim and prepare and release the letter of denial today." The claim denial sent to the Kovaches incorporated language from Maguire's opinion letter, but was on Zurich letterhead and was signed on behalf of the company. Zurich, not Maguire, made the final decision regarding the Kovaches' claim.

To the extent that the Kovaches argue that de novo review should apply because Zurich's use of an outside expert advisor was not explicitly authorized by the Plan, that argument is not properly before us because the Kovaches did not raise it before the district court. *See Chandler v. Jones*, 813 F.2d 773, 777 (6th Cir. 1987) ("It is a well-established principle of appellate review that appellate courts do not address claims not properly presented below."). But this contention, even if it were properly before us, lacks any support in the caselaw. Zurich's retention of outside counsel to assist it in its claim determination would in fact seem to demonstrate that it took the process seriously and attempted to ensure that its decision had a strong legal basis. *See, e.g.*, *Karras v. First Colony Life Ins. Co. Pension Plan*, No. 6:05-cv-00031, 2006 U.S. Dist. LEXIS

18969, at *22 (W.D. Va. Apr. 13, 2006) ("[T]he fact that the Plan Administrator hired and relied upon outside legal counsel bolsters its final conclusion.").

The Kovaches have not demonstrated that Zurich's retention of Maguire amounted to the sort of improper delegation of authority that would require us to apply a de novo standard of review to Zurich's decision. We will thus proceed to examine Zurich's denial of the Kovaches' claim under the arbitrary-and-capricious standard.

## C.     Zurich's denial of coverage

Zurich denied coverage because it determined that Mr. Kovach's injuries were not the result of an "accident," but were the "reasonably foreseeable consequence of driving while highly intoxicated and under the influence of drugs." Moreover, Zurich decided that Mr. Kovach's injuries fell under the Plan's self-inflicted-wound exclusion because he "intentionally ingested a significant quantity of alcohol and apparently opiates and benzodiazepines, and his injury occurred as a result of polysubstance intoxication." Zurich based this conclusion on a body of federal common law from within this circuit addressing allegedly similar scenarios.

We note at the outset that drunk driving is ill-advised, dangerous, and easily avoidable. But, as will be discussed in more detail below, so are many other activities that contribute to wrecks that a typical policyholder would consider "accidental." We must thus refrain from allowing our moral judgments about drunk driving to influence our review of Zurich's interpretation of the relevant Plan provisions.

## D.     Whether *Lennon* controls

The sole published decision of this court that has dealt with the issues now before us is *Lennon v. Metropolitan Life Insurance Co.*, 504 F.3d 617 (6th Cir. 2007). That case involved what the court described as "grossly negligent," "reckless drunk driving," *id.* at 618, 624, and resulted in three separate opinions—a lead, a concurrence, and a dissent. Lennon was insured under an ERISA-covered personal accident insurance (PAI) policy. On the day in question, he drove his car at a high rate of speed the wrong way down a one-way portion of a divided street, losing control of his vehicle. The car

hit a curb, flew into the air, and slammed into a brick wall, killing Lennon.  Lennon's BAC was later measured at .321, more than three times the legal limit in effect at the time (.10) and high enough to render him only semi-conscious.  *See* Blood Alcohol Levels and Metabolism, http://www.radford.edu/~kcastleb/bac.html.  Death has been documented to occur at BACs starting at .35.  *Id.*

> Lennon's PAI policy provided in pertinent part as follows:
>
> If, while insured for Personal Accident Insurance, an [insured] sustains accidental bodily injuries, and within one year thereafter shall have suffered loss of life . . . as a direct result of such bodily injuries independently of all other causes, [MetLife] shall pay the benefit specified for such Losses.

*Lennon*, 504 F.3d at 619 (alterations in original).  MetLife denied benefits to Lennon's estate, noting in its denial letter that Lennon's BAC was three times the legal limit and that "[t]he act of driving impaired . . . rendered the infliction of serious injury or death reasonably foreseeable and, hence, not accidental."  *Id.* at 620.  It thus concluded that Lennon's death was not "directly the result of accidental injuries, independent[] of all other causes."  *Id.*

The lead opinion concluded that MetLife had not acted arbitrarily and capriciously in denying coverage for Lennon's death.  *Id.* at 620-21.  Borrowing terminology from tort law, the lead opinion characterized Lennon's behavior as "grossly negligent."  *Id.* at 621.  It therefore reasoned that "in extreme cases courts may treat wanton misconduct more like an intentional tort than like negligence[,]" *id.* (quoting Dan R. Dobbs, The Law of Torts § 147, at 350-51 (2000)), and that a plan administrator could similarly "treat such conduct as not accidental under a policy that only covers accidents."  *Lennon*, 504 F.3d at 621.

The lead *Lennon* opinion also stated that the number of cases holding that drunk driving wrecks are not accidents "independently supports the conclusion that MetLife's determination was not arbitrary and capricious."  *Id.* at 622-23 (collecting cases).  On this point, the concurring opinion agreed.  *Id.* at 625-26 (Boggs, C.J., concurring).  Importantly, though, the lead opinion specifically cautioned that

> we do not reach the question of whether a fiduciary can reasonably deny "accidental" benefits for [an] injury that results from any negligent or any illegal behavior, *or from driving while only somewhat impaired.*

*Id.* at 624 (emphasis added).  The concurring opinion, moreover, made clear that the majority's holding did not reach the question of whether to approve or disapprove of MetLife's use of a "reasonably likely to occur" standard for defining what is an "accident," and further noted that its conclusion was based on "the set of facts presented here . . . ."  *Id.* at 626.

Although the insightful analyses from all three of the *Lennon* opinions are highly informative for our present review, *Lennon* is distinguishable and therefore not controlling.  The most obvious distinction is the disparity between Lennon's and Mr. Kovach's BACs—.321 versus .148.  Lennon's BAC was more than twice that of Mr. Kovach's and more than four times the legal limit (.08) in place at the time of Mr. Kovach's wreck.  The lead *Lennon* opinion further acknowledged that "drivers with blood-alcohol levels above the legal limit as a group are far more likely to arrive home safely than drivers who are *extremely drunk*."  504 F.3d at 623 (emphasis added) (citing *Stamp v. Metro. Life Ins. Co.*, 466 F. Supp. 2d 422, 432 (D.R.I. 2006) ("The statistics . . . are meaningless in this context. . . .  They do not consider . . . the degree of his intoxication.")).  For this reason, the *Lennon* majority refused to impose a blanket standard allowing insurers to consider injuries resulting from *any* wreck in which the driver is intoxicated as nonaccidental.  *Id.* at 624.  Compared to the dangerously high level of intoxication involved in *Lennon*, Mr. Kovach's intoxication appears to fall into the "somewhat impaired" category that *Lennon* declined to address.

*Lennon* is distinct from the case before us in other ways as well.  The lead opinion was careful to note that the circumstances of Lennon's crash were extreme:

> This case involved facts—Lennon's extremely high blood-alcohol content, the manner in which Lennon's car flew off the road, the lack of an alternative explanation for the death, and Lennon's driving the wrong way down the street—that rendered at least reasonable MetLife's conclusions that Lennon did not die as a result of an "accident" under the Plan.

*Id.* at 622. We agree with the *Lennon* lead opinion that driving the wrong way down a one-way street while drunk to the point of semi-consciousness, and at a rate of speed so fast that the vehicle is on the verge of becoming airborne, amounts to a level of recklessness that would render the resulting injuries highly likely, and therefore not accidental.

The facts surrounding Mr. Kovach's crash, however, are nowhere near as dramatic as those in *Lennon*. Besides driving while intoxicated—at a level less than half that of Lennon—the only other out-of-the-ordinary thing that Mr. Kovach did was run a stop sign, something done with unfortunate frequency by sober drivers. There is no indication in the record that Mr. Kovach was traveling at an abnormally high rate of speed or driving in an otherwise risky manner.

Finally, we note that Zurich did not—and could not—have relied on *Lennon* in its review of the Kovaches' claim. The *Lennon* opinion was issued more than a year after the Kovachs' claim was formally denied by Zurich.

Our dissenting colleague, however, contends that we have overlooked two critical factors in our analysis: (1) that Mr. Kovach was riding a motorcycle, which the dissent characterizes as "an especially dangerous form of transportation," and (2) that he was "intoxicated on opiates" at the time of the accident. (Dissenting Op. at 25-26) According to the dissent, these two "overlooked" factors establish that Mr. Kovach's behavior was as risky as Lennon's, and that an accident under such circumstances was "highly likely" to occur. (Dissenting Op. at 31, 33) But the record does not support either contention.

First, with regard to the motorcycle argument, the statistics cited by the dissent show at most an increased likelihood of *death or injury* during a motorcycle crash, not an increased likelihood of a *crash* as an initial matter. (Dissenting Op. at 30-31) But the latter, not the former, is the relevant event in the instant case. Moreover, in making its coverage decision, Zurich did not rely on the fact that Mr. Kovach was on a motorcycle when the accident occurred, so whether a motorcycle is a particularly dangerous form of transportation is irrelevant to our analysis. *See Shelby County Health*

*Care Corp. v. Majestic Star Casino, LLC*, 581 F.3d 355, 368-69 (6th Cir. 2009) (holding that a plan administrator cannot support its argument on appeal with a fact not relied upon in its initial coverage determination).

Second, the dissent infers that Vicodin, an opiate, was in Mr. Kovach's system at the time of the accident because he had a prescription for the drug. (Dissenting Op. at 27)  But a prescription alone is not sufficient proof that Mr. Kovach was actually taking the drug, or that it was still in his system at the time of the accident.  The Physicians' Desk Reference cited by the dissent simply states that Vicodin "may impair" mental or physical abilities.  (Dissenting Op. at 28)  This is not proof that it did so for Mr. Kovach, and certainly does not show that the collision was "highly likely" to occur even if some of the drug was still in his system at the time of the accident.  (See Part II.E.6. below for a discussion of the "highly likely" standard to be applied in determining whether an event is "accidental.")

Furthermore, Zurich could have obtained the relevant records from the Robinson Memorial Hospital (the first hospital to which Mr. Kovach was taken) if it had wanted to, records that would have allegedly established that Mr. Kovach was on Vicodin at the time of the accident.  Zurich apparently decided not to pursue the issue despite the fact that it had the burden of proving that Mr. Kovach was under the influence of Vicodin at the time of the accident.  Moreover, because Zurich did not pursue the matter and did not rely on the Vicodin-related argument in denying coverage, it is not relevant to our analysis. *See Majestic Star Casino, LLC*, 581 F.3d at 368-69.

**E.       Zurich's definition of "accidental"**

Having determined that *Lennon* does not control the case before us, we are left to examine Zurich's denial of benefits based on its interpretation of the term "accidental" as not including drunk-driving wrecks.  Our task is not to address whether that decision was *correct*.  Instead, the question before us is whether it was arbitrary and capricious. We answer that question in the affirmative.

The central focus of our review is whether Zurich's interpretation of the term "accidental," as used in the Plan, was reasonable. *See Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 300 (6th Cir. 2006) (stating that an administrator's interpretation of plan provisions will be upheld if it is reasonable). ERISA requires that benefit plans must be "written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a). Accordingly, "[i]n interpreting a plan, the administrator must adhere to the plain meaning of its language as it would be construed by an ordinary person." *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004). "[A]n insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy." *Walker v. Metro. Life Ins. Co.*, 24 F. supp. 2d 775, 780 (E.D. Mich. 1997) (quoting *Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996)).

### 1.     *Ordinary meaning*

We have little doubt that an ordinary person would characterize Mr. Kovach's collision at the intersection to be an accident. Webster's dictionary offers the following pertinent definition of the word "accidental":

> *2 a:* occurring unexpectedly or by chance *b:* happening without intent or through carelessness and often with unfortunate results

http://www.merriam-webster.com/dictionary/accidental. Mr. Kovach's wreck clearly fits this definition in that he did not "expect" or "intend" to hit another vehicle. Rather, he "carelessly"—or, more accurately, negligently—ran a stop sign, with the "unfortunate result" that he was injured in the ensuing collision.

A hypothetical witness placing a 911 call to report Mr. Kovach's crash would almost certainly have reported that he or she had just seen an accident. Indeed, Zurich's own language throughout the administrative record reflects that Mr. Kovach's wreck was considered to be an accident in the ordinary sense of the word. In particular, the company frequently referred to the crash as an accident in its own documentation regarding the claim:

Committee determined that the issue regarding which party was at fault for the *accident* which resulted in the Insured's loss requires further clarification.

[The Committee] deferred its decision pending receipt of clarification from the relevant law enforcement authorities regarding which party was at fault in the *accident* at issue.

[The] claim is to be referred for legal opinion regarding the *accident* and alcohol involvement.

Atty advised that dscepancies [sic] in records regarding cause of *accident*.

Upon receipt of the medical records from Robinson Hospital and driving record, loss will be referred for legal coverage opinion, as the claimant was intoxicated at the time of the *accident*.

(Emphasis added.)

### 2.          *Zurich's reliance on caselaw*

Zurich defends its interpretation of the word "accidental" almost entirely on the basis that it relied on a body of caselaw holding that drunk-driving wrecks are not accidents for ERISA purposes. But in this case, where Mr. Kovach's intoxication and the circumstances of his accident were by no means extreme (as they were in *Lennon*), we conclude that Zurich was unreasonable in relying solely on caselaw to justify its denial of benefits to the Kovaches. This court has held, in the ERISA context, that even under the highly deferential arbitrary-and-capricious standard, courts have

> an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the . . . evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision . . . . Even under the deferential review we will not uphold a termination when there is an absence of reasoning in the record to support it.

*McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citation omitted). Moreover, the cases Zurich relied upon in its denial of benefits—*Jones v. Metropolitan Life Insurance Co.,* 385 F.3d 654 (6th Cir. 2004); *Nelson v. Sun Life Assurance Co. of*

*Canada*, 962 F. Supp. 1010, 1012-13 (W.D. Mich. 1997); *Walker v. Metropolitan Life Insurance Co.*, 24 F. Supp. 2d 775, 780-81 (E.D. Mich. 1997); *Miller v. Auto-Alliance International, Inc.*, 953 F. Supp. 172, 175-77 (E.D. Mich. 1997); *Cates v. Metropolitan Life Insurance Co.*, 14 F. Supp. 2d 1024, 1027 (E.D. Tenn. 1996); and *Fowler v. Metropolitan Life Insurance Co.*, 938 F. Supp. 476, 480 (W.D. Tenn. 1996)—do not uniformly support Zurich's position.

The only Sixth Circuit opinion cited in the denial letter, *Jones v. Metropolitan Life*, did not even involve intoxication, and in fact supports the Kovaches. There, the court concluded that MetLife acted arbitrarily and capriciously by interpreting the term "accident" in a manner that excluded coverage where the plaintiff, a nurse, injured her knee while bending down to administer first aid to a patient. It thus "added an eligibility requirement [that the injury be caused by an external force or event] under the guise of interpreting the term 'accident' that does not exist in either the Plan documents or federal common law." 385 F.3d at 659, 665. Further, in *Walker v. Metropolitan Life*, the insured had a BAC of .22—substantially higher than Mr. Kovach's .148—and was driving at a high rate of speed when he crashed into a wall. 24 F. Supp. 2d at 777. And the injured driver in *Miller v. Auto-Alliance* had a BAC of .29, 953 F. Supp. at 173, while the insured in *Fowler v. Metropolitan Life* had a BAC of .26, 938 F. Supp. at 478. Finally, the policy in *Cates v. Metropolitan Life* excluded injuries resulting from "the use of any drug or medicine." There, the administrator concluded in its denial letter that "alcohol is considered by the medical community to be a drug." 14 F. Supp. 2d at 1025. No such exclusion is present in the Kovaches' AD&D policy. The district court in *Cates*, without providing any analysis, upheld the insurer's denial of the claim on the basis that the insured's injuries were reasonably foreseeable at a BAC of .18 and therefore nonaccidental. *Id.* at 1027.

Zurich is essentially left with only two drunk-driving decisions involving facts generally analogous to Mr. Kovach's collision—*Nelson v. Sun Life,* 962 F. Supp. at 1013 (upholding the denial of benefits to an insured who was involved in a wreck while driving with a BAC of .18), and *Cates v. Metropolitan Life*. But having to place all of its eggs in the basket of these two lower court decisions (one of which, *Cates,* is

factually distinguishable because of the drug exclusion) to deny the Kovaches' claim was unreasonable in light of the decision in *Harrell v. Metropolitan Life Insurance Co.*, 401 F. Supp. 2d 802 (E.D. Mich. 2005), which reached the opposite result.  There, the insured died in a wreck and was found to have a BAC of .17.  *Id.* at 805.  The district court rejected the plan administrator's argument that the death was not "accidental," holding that, "to allow denial of benefits when a bad result is 'reasonably foreseeable' undermines a common conception of 'accidental injuries,' and therefore could violate ERISA's requirement that benefit plans be 'written in a manner calculated to be understood by the average plan participant.'"   *Id.* at 812-13 (quoting 29 U.S.C. § 1022(a)).

### 3.       *The foreseeability of injury*

Zurich has offered no evidence whatsoever about the foreseeability of harm to Mr. Kovach based on his BAC of .148.  Perhaps the reason that it did not do so is that its outright exclusion of alcohol-related collisions from its definition of "accidental" is not born out by the statistics, as aptly summarized in the *Lennon* dissent:

> [A]ccording to the National Highway Traffic Safety Administration, 17,105 people died in alcohol-related motor vehicle crashes in 2003, a figure that accounts for 40 percent of all traffic-related deaths that year. The Federal Bureau of Investigation's 2003 Uniform Crime Report indicates that an estimated 1,448,148 motorists were arrested for driving under the influence that year. Finally, the Substance Abuse and Mental Health Services Administration, in a report issued September 2005, found an estimated 30.7 million persons nationwide took alcohol-impaired trips during 2003.  Even assuming only 10 million alcohol-impaired trips occurred that year,  a mere 14.4 percent of impaired motorists were arrested, while 0.17 percent died in alcohol-related incidents. Thus, injury or death most certainly cannot be deemed a "highly likely" consequence of driving while intoxicated. *See West v. Aetna Life Ins. Co.*, 171 F. Supp. 2d 856, 904 (N.D. Iowa 2001) ("What 'common knowledge' should actually tell a person driving while intoxicated is that he or she is far more likely to be arrested for driving while intoxicated than to die or be injured in an alcohol related automobile crash, and far more likely to arrive home than to be either arrested, injured, or killed.").

*Lennon*, 504 F.3d at 630 (Clay, J., dissenting).

The *Lennon* dissent employed a conservative estimate of the number of drunk drivers per year that was more than three times less than the actual estimate provided by the Substance Abuse and Mental Health Services Administration. Using the full 30.7 million figure results in a death rate of only one-twentieth of one percent. These statistics should not be taken as a dismissal of the tragic consequences of drunk-driving wrecks; instead, they are intended to show only that the likelihood of serious injury or death for each person who drives while intoxicated is something far less than "reasonably foreseeable"—the standard used by Zurich in denying the Kovach's claim.

### 4.        *Other risky activities*

We also note that Zurich's definition of "accidental," which excludes activities that render the risk of serious injury "reasonably foreseeable," would bar accidental injury coverage in numerous situations in which the typical policyholder would expect to be covered. For example, a driver who runs off the road while typing a text message into a mobile phone would certainly consider himself or herself to have been involved in an "accident," and would therefore expect to be entitled to benefits under an accidental-injury policy. But the New York Times recently reported on a Virginia Tech study showing that text messaging increased a driver's risk of collision by *23 times*. Matt Richtel, *In Study, Texting Lifts Crash Risk by Large Margin*, N.Y. Times, July 27, 2009. Moreover, a study of young drivers in England found that reaction times of young drivers were reduced by text messaging *three times* more than by drinking alcohol to the legal limit. Helen Nugent, *Texting While Driving Is More Dangerous than Drink-Driving*, London Times, September 18, 2008.

A driver also substantially increases his or her risk of a collision by driving while fatigued, *see* Lori Yerdon, *Fatigued Driving Comparable to Drunk Driving*, U.S. Army Combat Readiness/Safety Center News Release, June 16, 2008, available at https://safety.army.mil/LinkClick.aspx?fileticket=TpDV4aOpMas=&tabid=691; driving at excessive speeds, *see Synthesis of Safety Research Related to Speed and Speed Limits*, http://www.tfhrc.gov/safety/speed/speed.htm; and driving after taking certain over-the-counter medications, notably antihistamines, opioids, and muscarinic antagonists,

*see* U.K. Dept. for Transport, *Road Safety Report No. 24: Over-the-Counter Medicines and the Potential for Unwanted Sleepiness in Drivers*, available at http://www.dft.gov.uk/pgr/roadsafety/research/rsrr/theme3/overthecountermedicinesa ndth4772. (Note that we do not endorse the results of the cited studies; these citations are included only to bolster the intuitive notion that the risk of driving can be substantially increased when drivers engage in common activities that do not carry the moral stigma of drunk driving.)

If Zurich denied coverage for injuries involving the above factors on the basis that they were not caused by an "accident," we would likely conclude that its decision was arbitrary and capricious in light of a typical policyholder's expectations. We see no reason not to reach the same conclusion based on the Kovaches' legitimate expectations in the present case.

### 5. *Lack of a specific exclusion*

Zurich could have easily added an exclusion in the Plan for driving while intoxicated if it had wished to do so, but it did not. The sheer number of court cases nationwide involving disputes over claims by drunk drivers certainly would have put it on notice that it would likely face claims under its AD&D policies based on injuries sustained in alcohol-related collisions. Zurich did, however, include specific exceptions for "skydiving, parasailing, hangglinding [sic], bungee-jumping, or any similar activity." But under the "reasonably foreseeable injury" standard that Zurich employed to deny the Kovaches' claim, these exclusions would be unnecessary and redundant because all of the listed activities involve a reasonably foreseeable risk of injury. *See* Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

In effect, Zurich's definition of the term "accidental" has added an eligibility requirement (i.e., an exclusion) that is not in the Plan. Based on the facts of the current case, that renders its interpretation of the Plan arbitrary and capricious. *See Jones v. Metro. Life. Ins. Co.*, 385 F.3d 654, 665 (6th Cir. 2004) ("In this case, MetLife added an

eligibility requirement under the guise of interpreting the term "accident" that does not exist in either the Plan documents or federal common law; therefore, MetLife's interpretation of the Plan is arbitrary and capricious."). We also note that to the extent Zurich relied on the presence of drugs in Mr. Kovach's blood samples to deny coverage, where the record provides no basis to find that these drugs were present *before* the accident, that reliance is a further indication of an arbitrary and capricious decision.

### 6. Wickman *standard*

Given the varying interpretations of the word "accidental" that have been employed by the district courts in this circuit, *compare Nelson v. Sun Life Assurance Co. of Canada*, 962 F. Supp. 1010, 1013 (W.D. Mich. 1997) (applying a "reasonable foreseeability" standard) *with Harrell v. Metropolitan Life Insurance Co.*, 401 F. Supp. 2d 802, 812-13 (E.D. Mich. 2005) (applying a "highly likely to occur" standard), the time is ripe for this court to adopt a uniform standard for determining whether an injury is "accidental" in ERISA cases where the word is not otherwise defined in the applicable policy. After giving this matter considerable thought, we adopt the key holding announced in the seminal First Circuit case of *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990). This key holding consists of asking "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* at 1088.

As stated by the concurring opinion in *Lennon*,

> *Wickman*'s standard . . . is a high bar, and arguably many collisions involving a drunk driver would not meet it: as a number of courts have noted, the number of drunk driving arrests swamps the number of drunk driving injuries or deaths, making it difficult to conclude that an injurious collision is "highly likely to occur as a result" of driving while intoxicated.

504 F.3d at 625.

The dissent, however, asserts that "[t]he combination of alcohol and Vicodin made it even *more likely* that a traffic collision would occur, rendering Kovach's

behavior all the more reckless." (Dissenting Op. at 29) (emphasis added). Driving while intoxicated concededly makes a collision "more likely" to occur than if the driver is not intoxicated, but this does not mean that a collision under such circumstances is "highly likely." Solely for the purpose of illustration, and without any pretense of being statistically accurate, let us hypothetically assume that a sober driver has a 1% probability of a collision. By contrast, assume that driving while intoxicated results in a 10% probability of a collision, leading to the conclusion that a collision is "more likely" to occur while driving intoxicated.

But to reach the level of "more likely than not," the probability of an accident would, by definition, have to be in excess of 50%. And because "highly likely," which is necessary under the *Wickman* standard to obviate Zurich's liability for an accidental injury, obviously means a good bit more probable than simply "more likely than not," one might contemplate a 75% or higher probability before the average person would be persuaded that a collision was "highly likely" to occur. So even if the motorcycle/Vicodin factors relied on by the dissent made Mr. Kovach's accident *more* likely, that is not sufficient to meet the *Wickman* standard and thereby relieve Zurich of its policy obligations.

The dissent criticizes this analysis by citing *Stamp v. Metropolitan Life Insurance Co.*, 531 F.3d 84 (1st Cir. 2008), for the proposition that the "highly likely" standard is not wedded to the "more likely than not" standard. (Dissenting Op. at 29 n.4) *Stamp* is distinguishable from the present case, however, because the insured in *Stamp*, like the insured in *Lennon*, was driving with a BAC of more than three times the legal limit. *Stamp*, 531 F.3d. at 86. Thus, Stamp's behavior was materially closer to the extreme alcohol-related behavior at issue in *Lennon* than Mr. Kovach's. This material distinction in circumstances precisely meshes with a key point stressed by the majority opinion in *Stamp* that

> courts have emphasized the decedent's level of intoxication when
> determining that a plan administrator's denial of benefits was
> reasonable. . . . We endorse this approach. The *Wickman* analysis does
> not require a categorical determination that all alcohol-related deaths are

per se accidental or nonaccidental.  Rather, it leads us to consider the circumstances of the fatal event in question.

*Id*. at 90-91 (internal citations omitted).

We further believe that the Russian roulette example cited in *Stamp* and by the dissent is inapposite because playing Russian roulette has zero social utility, whereas using motorized transportation to move about has a very high level of social utility.  In sum, riding a motorcycle while "somewhat impaired" (as opposed to being "grossly intoxicated") may make an accident more likely to occur, but the risk of such an accident is not so "overwhelmingly disproportionate" when compared to the social utility involved, *see id.* at 93 (citation omitted), that an ordinary person would consider a collision involving the impaired driver as nonaccidental.

The solution for insurance companies like Zurich is simple: add an express exclusion in policies covering accidental injuries for driving while under the influence of alcohol, or for any other risky activity that the company wishes to exclude. Policyholders would thus be able to form reasonable expectations about what type of coverage they are purchasing without having to make sense of conflicting bodies of caselaw that deal with obscure issues of contractual interpretation.  Had Zurich included such an exclusion in first place, this litigation would have been entirely unnecessary.

### 7.     *Conclusion*

Zurich's decision to deny benefits to the Kovaches was contrary to the everyday meaning of the word "accidental" as it would be understood by a typical policyholder, and was based almost entirely on a body of largely distinguishable district court cases. Further, Zurich's estimation of the foreseeability of Mr. Kovach's injuries is undermined by statistics showing that the likelihood of a wreck for an individual driving at less than extreme levels of intoxication is exceedingly small as a percentage of all such driving expeditions, and arguably represents Zurich's improper insertion of moral judgments into its analysis of the Plan's provisions.  This observation is born out by the fact that insureds would almost certainly expect to be covered for injuries resulting from many

other activities that are at least as risky as driving while intoxicated, such as driving while text messaging or while sleep-deprived.

In sum, Mr. Kovach's injuries were not "highly likely to occur" as a result of his intoxication, in contrast to the injuries that *were* highly likely to occur under the facts in *Lennon*. Zurich's interpretation of the Plan's provisions amounts to an additional, unwritten exclusion for all drunk-driving injuries, which is not permitted under even the most deferential standard of review. For all of these reasons, we conclude that Zurich's denial of coverage based on Mr. Kovach's injuries being nonaccidental was unreasonable in light of the Plan's provisions, and thus arbitrary and capricious. *See Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 300 (6th Cir. 2006).

**F.       The self-inflicted-wound exclusion**

The alternate explanation offered by Zurich for its denial of coverage to the Kovaches was that Mr. Kovach's injuries fell under the Plan's self-inflicted-wound provision. The relevant language provides that no benefits are payable if the loss is "caused by or connected with . . . a purposeful self-inflicted wound." Zurich reasons that Mr. Kovach's injury resulted from his intentional act of becoming drunk and operating a motorcycle, and was therefore self-inflicted.

The Eighth Circuit, sitting en banc, rejected an identical argument in *King v. Hartford Life & Accident Insurance Co.*, 414 F.3d 994 (8th Cir. 2004) (en banc). There, the insured had died in a motorcycle accident with a BAC of .19. *Id.* at 997. That court held, and we agree, that "[t]he most natural reading of the exclusion for injuries contributed to by 'intentionally self-inflicted injury . . .' does not include injuries that were unintended by the participant, but which were contributed to by alcohol intoxication." *Id.* at 1004. Although Mr. Kovach acted intentionally in drinking to excess and then riding his motorcycle, nothing in the record indicates that he did so with a mind towards harming himself. Zurich's interpretation of the exclusion in question conflates intentional *actions* with intentional *results*. Mr. Kovach's injuries, in other words, were the result of the collision, not simply a consequence of his acts of drinking and driving. After all, "[o]ne rarely thinks of a drunk driver who arrives home safely as

an 'injured' party." *Id.* Mr Kovach's intoxication likely contributed to the collision, but to define his excessive drinking as a "purposely self-inflicted wound" would be an illogical and "startling construction." *Id.* Zurich's denial of the Kovaches' claim on this basis was therefore arbitrary and capricious.

## G.          Appropriate proceedings on remand

This leaves us with a choice as to the appropriate proceedings on remand. In ERISA cases, appellate courts have the power either to send the matter back to the plan administrator for further consideration or to make a final decision on the merits. *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 24 (1st Cir. 2003) ("Once a court finds that an administrator has acted arbitrarily and capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits."). This court has frequently awarded benefits outright in lieu of a remand for reconsideration by the plan administrator. *See, e.g.*, *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) ("[W]e find no need to remand this matter for additional consideration by LINA because of our conclusion that Cooper has clearly established that she is disabled under the Plan."); *Kalish v. Liberty Mut./Liberty Life Assurance Co.*, 419 F.3d 501, 513 (6th Cir. 2005) (concluding that the appropriate remedy was an immediate award of benefits rather than a remand to allow the plan administrator to consider evidence that it had previously ignored).

The case before us has no unresolved factual issues; instead, its resolution revolves around the proper interpretation of the Plan provisions—a question of law that we have answered in the Kovaches' favor. Having determined that Mr. Kovach's collision falls within the definition of "accidental" and is not subject to the self-inflicted-wound exclusion, we thus conclude that the proper disposition of this case is an award of benefits to the Kovaches. *See Canseco v. Constr. Laborers Pension Trust*, 93 F.3d 600, 609 (9th Cir. 1996) (concluding that no remand is necessary where no new factual determinations remain).

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for the entry of a judgment in favor of the Kovaches.

———————————

**DISSENT**

———————————

McKEAGUE, Circuit Judge, dissenting.    I would affirm the district court's decision.  The majority's lengthy opinion raises many arguments that I feel compelled to address but, ultimately, I view this as an unfortunate but fairly simple case.  When plaintiff-appellant Thomas Kovach decided to mount his motorcycle and drive it on crowded roadways, with a blood alcohol content (BAC) nearly double the legal limit, he engaged in high-risk behavior that made it reasonably foreseeable and highly likely that he would be injured as a result of his choices.  It was, therefore, not arbitrary and capricious for defendant-appellee Zurich to determine that the ensuing traffic collision was not accidental and to deny his claim.

Initially, I emphasize that our review of this case is governed by the arbitrary and capricious standard.  The arbitrary and capricious standard requires this panel to uphold the plan administrator's decision, "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991), and if the decision is "'rational in light of the plan's provisions.'" *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996)).  Furthermore, plan administrators have "great leeway in interpreting ambiguous terms." *Moos v. Square D Co.*, 72 F.3d 39, 42 (6th Cir. 1995) (citing *Cook v. Pension Plan for Salaried Employees of Cyclops Corp.*, 801 F.2d 865 (6th Cir.1986)).  Despite paying lip service to the correct standard of review, the majority's analysis smacks of a much more rigid standard of review, and concludes with an impermissible substitution of its judgment for that of the plan administrator.

Furthermore, I find that the majority's analysis overlooks two crucial factors: (1) Kovach was driving a *motorcycle* at the time of the accident, an especially dangerous form of transportation, and (2) it was not arbitrary and capricious for Zurich to conclude

that, in addition to having a BAC nearly twice the legal limit, Kovach was also intoxicated on *opiates* at the time of the accident.

## A. Zurich's finding of opiate use

Zurich's decision to partially base its denial of Kovach's claim on the conclusion that Kovach was under the influence of opiates at the time of the traffic collision was the result of a deliberate, principled reasoning process and was supported by substantial evidence. (Administrative Record "A.R." 58) (finding Kovach's death not accidental because it "was a reasonably foreseeable consequence of driving while highly intoxicated and under the influence of drugs"). A number of considerations support Zurich's determination that Kovach was on opiates at the time of the traffic collision: (1) the toxicology report showing a positive test for opiates, (2) evidence indicating Kovach regularly used Vicodin prior to the traffic collision, (3) Kovach's failure during Zurich's review of his claim to dispute Zurich's findings or provide clarifying evidence. Kovach cannot fail to dispute Zurich's findings and then expect factual ambiguities in the record to be resolved in his favor on appeal. *See Perry v. Simplicity Eng'g*, 900 F.2d 963, 966-67 (6th Cir.1990) (noting that the primary goal of ERISA is to provide "a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously" and concluding that the claimant had not presented sufficient evidence on a key issue to the plan administrator until he was before the district court and, therefore, that denial was proper); *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 457 (6th Cir. 2003) ("The scope of the district court's and this court's review of the denial of benefits is limited to the administrative record available to the plan administrators when the final decision was made.").

The administrative record shows that MetroHealth Medical Center tested Kovach's blood at the time of his admission, and the results were positive for opiates. (A.R. 129). During the processing of his claim, Kovach did not deny or contest with contrary evidence, Zurich's finding that his use of opiates contributed to the collision,

and that he was on drugs at the time of the traffic collision. (*See* A.R. 45-50).[1] Instead, it is only in his arguments before this court and the district court that Kovach now claims that the opiates in his system were the result of drugs administered to him by medical personnel *after* the traffic collision. (Appellant's Br. at 6). The only evidence he cites for this, and the only evidence in the administrative record, is the notation by MetroHealth Life Flight personnel who took him from Robinson Memorial Hospital, where he was initially admitted after the traffic collision, to MetroHealth. (A.R. 75, 129) (the notation indicated that "morphine," an opiate, was administered to Kovach during the flight).

However, there is documented evidence in the administrative record in the form of Kovach's admission report at MetroHealth, which Zurich had to consider and which supports its determination that Kovach was on opiates at the time of the accident. Kovach's admission report from MetroHealth lists all of the medications that he was on at the time he was admitted. This information was provided to medical personnel at MetroHealth by Kovach, his family, or other medical personnel to enable them to accurately treat him. The admission report clearly shows that, for months before the collision, Kovach had been prescribed Vicodin–an opiate–with instructions to take it every six hours. (A.R. 297, 85). The report also shows Kovach's frequent refills of his Vicodin prescription, including his most recent refill, just eighteen days before the collision, and it certainly provided another reasonable explanation for the positive opiate tests in his bloodstream and provided substantial evidence for Zurich to conclude that Kovach was under the influence of opiates at the time of the collision. *Id.*

The evidence in the record, when coupled with Kovach's conduct before the plan administrator substantiates the reasonableness of Zurich's finding that Kovach was on opiates at the time of the collision, and its decision to base the denial of his claim in part on this factor. The use of even a legally prescribed opiate like Vicodin, in conjunction with alcohol, made it even more reasonably foreseeable or highly likely that Kovach's

---

[1] In his response to the denial letter, Kovach's lawyer does not once dispute that Kovach was on opiates at the time of the accident. Furthermore, he attached an affidavit from Kovach to his response, which also does not dispute that Kovach was on opiates at the time of the accident.

ability to safely drive his motorcycle would be significantly impaired. *See Physicians' Desk Reference*, 529-30 (63d ed. 2009) ("[Vicodin], like all narcotics, may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks such as driving a car or operating machinery; patients should be cautioned accordingly. Alcohol and other CNS [Central Nervous System] depressants may produce an additive CNS depression, when taken with this combination product, and should be avoided."). Hence, Zurich's findings that Kovach voluntarily and intentionally ingested opiates before driving his motorcycle reasonably supported its conclusion that his claimed injuries were caused not by an "accident" but by deliberate or reckless misconduct.

B.    *Lennon*

Despite the fact that it was decided after Zurich denied Kovach's claim, the reasoning employed in *Lennon*, a closely analogous case, extends to this case. *See Lennon v. Metropolitan Life Ins. Co.*, 504 F.3d 617, 618-26 (6th Cir. 2007) (upholding a plan administrator's finding that a motorist's high risk behavior while driving drunk was not accidental and provided a valid ground to deny his beneficiary's claim). The majority endeavors to distinguish *Lennon* but, despite these efforts, the fact remains that Kovach engaged in the same type of voluntary high risk behavior exhibited in *Lennon*; behavior that meant it was not arbitrary and capricious for the plan administrator to find that his traffic collision was not an accident. The majority finds particular significance in the fact that Lennon's BAC level was more than double Kovach's BAC in this case. However, Kovach's BAC was still nearly double the legal limit at the time of his admission to Robinson Memorial Hospital. Thus, like Lennon, Kovach was illegally driving with a BAC well above the state presumption for intoxication.[2] The BAC levels have been set by the state legislature. It is the legislature, and not this court on a case to case comparison method, that determines when someone is too drunk to drive. By

---

[2] The majority cites the lead opinion in *Lennon* for the proposition that *Lennon* did not consider cases like Kovach's where the motorist is only "somewhat impaired." 504 F.3d at 624. There is no basis in the record to suggest that Kovach was only somewhat impaired. His BAC was nearly double the legal limit. Furthermore, Zurich found that he was on opiates at the time. The issue reserved in *Lennon* seems to cover drivers with a BAC much closer to or under the legal limit, and not on opiates.

legislative judgment Kovach, like Lennon, was too drunk to drive. *See Phelps v. Positive Action Tool Co.*, 26 Ohio St. 3d 142, 145 (1986) ("The legislature, on the basis of extensive research into the problem of drunken drivers, has determined and statutorily established that a blood alcohol level of .10 percent has an adverse effect on an individual's coordination and control and that an individual with that blood alcohol level is incapable of safely operating a motor vehicle.").[3]  Furthermore, Zurich reasonably found that Kovach was on opiates when his collision occurred.  The combination of alcohol and Vicodin made it even more likely that a traffic collision would occur, rendering Kovach's behavior all the more reckless.[4]

---

[3]Ohio has since lowered the BAC limit to .08%.

[4]The majority engages in statistical speculation that the "highly likely" standard it adopts "obviously means a good bit more probable than simply 'more likely than not,'" and concludes that "one might contemplate a 75% or higher probability before the average person would be persuaded that a collision was 'highly likely' to occur." (Majority Op. 20). While I understand that the majority undertakes this analysis "without any pretense of being statistically accurate," I don't think that the "highly likely" standard is wedded to the "more likely than not" standard. The First Circuit, which created the *Wickman* test which the majority adopts, agrees:

> Moreover, the focus of our objective analysis in *Wickman* was not on the statistical probability that death would occur from the decedent's actions. Instead, we were concerned chiefly with what a reasonable person would perceive to be the likely outcome of the intentional conduct. *Wickman*, 908 F.2d at 1089. Russian roulette provides an archetypal example of this critical distinction. From a statistical standpoint, the likelihood of dying from a single round of Russian roulette is 16%-one in six. Such a death is not "highly likely" if that phrase is taken to mean "more likely than not" or "substantially certain." In fact, those who play Russian roulette have a decent chance, statistically speaking, of not being injured. *Lennon*, 504 F.3d at 623. Nonetheless, such a death "would not be publicly regarded as an accident" because the mortal risk associated with playing Russian roulette is patently obvious to any reasonable person. *Wickman*, 908 F.2d at 1087. Similarly, even if Mrs. Stamp had adduced evidence that those who drive while extremely drunk have a better than even chance of arriving home safely, that evidence would not have been dispositive. Statistical analysis is simply not at the core of the *Wickman* analysis.  Instead, as the Sixth Circuit has explained, *Wickman's* framework reflects that "at some point the high likelihood of risk and the extensive degree of harm risked, weighed against the lack of social utility of the activity, become not marginally but so overwhelmingly disproportionate that the resultant injury may be outside a definition of 'accidental' that is not unreasonably narrow." *Lennon*, 504 F.3d at 623. It was not arbitrary for the plan administrator here to conclude that Mr. Stamp's decision to drive while grossly intoxicated qualifies as overwhelmingly and disproportionately risky conduct.

*Stamp v. Metro. Life Ins. Co.*, 531 F.3d 84, 89-90, 92-93 (1st Cir. 2008) (applying *Wickman's* definition of accidental in the context of a death resulting from driving while intoxicated and noting that "[a]pplying *Wickman*, federal courts have, 'with near universal accord,' upheld plan administrators' determinations that 'alcohol-related injuries and deaths are not "accidental" under insurance contracts governed by ERISA'" (numerous citations omitted)). The majority argues that "playing Russian roulette has zero social utility, whereas using motorized transportation to move about has a very high level of social utility." (Majority Op. 21).  I agree that using motorized transportation to move about has a high level of social utility.  However, riding a motorcycle with a BAC nearly double the legal limit while on opiates does not. (A.R. 454, 37) (noting that the accident occurred at approximately 7:30 p.m.).  Furthermore, driving a motorcycle with a BAC nearly double the legal limit while on opiates, significantly increases the likelihood

The majority also distinguishes *Lennon* by noting that, in addition to drunk driving, the *only other* thing Kovach did out of the ordinary was drive through a stop sign. In contrast, Lennon drove the wrong way up a one way street at a high rate of speed. However, running a stop sign at a crowded intersection, like driving at a high rate of speed up a one way street, is a voluntary illegal act. Thus, even though Kovach's activities were different from the activities of the claimant in *Lennon*, they were also similar in that they were voluntary, high-risk illegal activities. Under Ohio law, driving drunk (no matter how drunk) and driving through a stop sign (no matter how common it is) are both illegal activities.

In attempting to show that Kovach's behavior was less risky then Lennon's, the majority ignores another voluntary decision that Kovach made, the decision to ride a motorcycle while intoxicated. Both statistically and logically, a motorcycle is a more dangerous form of transportation than a car. The National Center for Statistics and Analysis released data on traffic safety showing that, "per vehicle mile traveled in 2006, motorcyclists were 35 times more likely than passenger car occupants to die in a motor vehicle traffic crash and 8 times more likely to be injured." Nat'l Hwy. Traffic Safety Admin., Nat'l Center for Statistics and Analysis, *Traffic Safety Facts: 2007 Data* (2008), DOT HS 810 993, at http://www-nrd.nhtsa.dot.gov/Pubs/810993.PDF. Driving a motorcycle is a voluntary decision that substantially enhances the risk of a death or injury.

When the decision to drive a motorcycle is coupled with the decision to drive while intoxicated, the risk of an injury further increases. The National Highway Safety Administration has published a report describing the increased risks of driving a motorcycle, as compared to other motor vehicles, while intoxicated: "[f]or example, 1 in 4 automobile driver fatalities in the United States were alcohol related during 2005. In comparison, a higher proportion of motorcycle rider

---

of an accident, when contrasted with driving while not intoxicated. In this case, I believe that Kovach's decision to drive his motorcycle while intoxicated created a high likelihood of risk that, when weighed against the lack of social utility of driving while intoxicated, was so overwhelmingly disproportionate that the resulting injury was clearly outside a definition of accidental that is not unreasonably narrow.

fatalities (1 in 3) were related to alcohol in the same year." U.S. Dep't of Trans., Nat'l Hwy. Traffic Safety Admin., *Effects of Alcohol on Motorcycle Riding Skills: Final Report*, DOT HS 810 877, Feb. 2008, http://www.nhtsa.dot.gov/staticfiles/DOT/NHTSA/Traffic%20Injury%20Control/Articles/Associated%20Files/HS810877.pdf (finding also that impairing effects on riding performance were evidenced at a BAC level of .08, the legal limit in Ohio). Thus, Kovach's decision to drive a motorcycle while intoxicated greatly enhanced the risk of harm in a manner analogous to the facts presented in *Lennon*, and justified as reasonable Zurich's decision to deny his claim.

## C.    Zurich's definition of accidental

Even apart from *Lennon*, Zurich's decision cannot reasonably be deemed arbitrary and capricious. Under the arbitrary and capricious standard, the plan administrator's decision does not have to follow a particular test, rather the plan administrator need only use a test that follows a deliberate, principled reasoning process. *See Lennon*, 504 F.3d at 625 ("If the administrator's decision here were subject to the district court's de novo review, its rejection of these cases in favor of the stricter standard advanced in *Wickman* (or some other standard entirely) might have been appropriate. But when it reviews under an arbitrary and capricious standard, the district court cannot simply substitute its judgment for that of the administrator" (Boggs, J. concurring) (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).).

### 1. The **Wickman** *standard*

Zurich based its decision to deny coverage on an interpretation of "accidental," the key term in the policy, that was not arbitrary and capricious. Although not obligated to, Zurich already used a test that incorporated the *Wickman* standard the majority now adopts and applies:

> Under applicable case law, an injury is accidental if it is neither subjectively expected nor objectively foreseeable. *Jones v. Metro Life Ins. Co.*, 385 F.3d 654 (6th Cir. 2004). A death or injury is objectively

foreseeable if a reasonable person with a background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain or highly likely to result from the conduct.

(Zurich's denial letter; A.R. 58-59).[5] This is, essentially, the same *Wickman* standard that the majority adopts. *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1088 (1st Cir. 1990) (the court looked first to the subjective "reasonable expectations of the insured when the policy was purchased" and, if there is insufficient evidence on this point, then the court looked to "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct"). In fact, it is difficult to see how "objectively foreseeable" (the term Zurich used to define the *Wickman* standard) and the "reasonably foreseeable" language used throughout the denial letter are conflicting standards. Instead, it appears that Zurich used objectively foreseeable as shorthand for the objective prong of the *Wickman* standard and reasonable foreseeable as shorthand for the combined objective and subjective prongs required by *Wickman*. Thus, the phrase "reasonably foreseeable," as used by Zurich, is practically equivalent to the *Wickman* standard, combining both its subjective and objective prongs.

Moreover, even if "reasonable foreseeable" is not a fair proxy for the *Wickman* standard, the majority in *Wickman* concluded that, "[l]egally, 'should have known' is synonymous with, if not even a higher standard than, the ***reasonable expectation standard*** we promulgated above. Similarly, 'substantially likely to occur' is an equivalent, if not tougher, standard to 'highly likely to occur.'" 908 F.2d at 1089 (emphasis added). Thus, *Wickman* itself recognized that its standard could be expressed in different words that represented an equivalent or higher standard. Again, it is difficult to see how the reasonably foreseeable language Zurich used in its denial letter is a different or lesser standard when compared to "should have known" or "substantially likely to occur," if it is different from the actual language of the *Wickman* standard (substantially certain or highly likely to result from) to begin with. Furthermore, as

---

[5]Indeed, in his appeal to Zurich from their denial, Kovach even criticizes Zurich for "incorrectly" using the *Wickman* standard, which "the Sixth Circuit has not adopted" for the definition of accident. (A.R. 46.)

emphasized above, the *Wickman* court labeled its test as "the reasonable expectation standard." Logically, reasonable expectation is nearly identical to reasonably foreseeable. Because Zurich applied an analysis that is similar to *Wickman* and used terms either nearly identical to the *Wickman* standard or meant to be a shorthand for the *Wickman* standard, its decision was not arbitrary and capricious.

The cases that Zurich discussed in its denial letter also analyzed, cited to, or relied on the Wickman standard in reviewing the decisions of plan administrators. *See Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, (6th Cir. 2004) (analyzing *Wickman* and describing it in terms similar to those used by Zurich); *Nelson v. Sun Life Assurance Co. of Canada*, 962 F. Supp. 1010, 1012-13 (W.D. Mich. 1997) (analyzing and using *Wickman* in deciding to uphold plan administrator's denial of benefits); *Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775, 780-82 (E.D. Mich. 1997) (upholding plan administrator's denial of claim after analyzing the facts under the controlling *Wickman* standard); *Miller v. Auto-Alliance Int'l, Inc.*, 175-77 (E.D. Mich. 1997) (citing to *Wickman*); *Cates v. Metro. Life Ins. Co.*, 14 F. Supp. 2d 1024, 1026-27 (E.D. Tenn. 1996) (relying on *Wickman* in upholding plan administrator's denial of benefits); and *Fowler v. Metro. Life Ins. Co.*, 938 F. Supp. 476, 480 (W.D. Tenn. 1996) (relying on *Wickman* in upholding plan administrator's denial of benefits).

Finally, applying the language from the *Wickman* standard to the facts of this case, as the majority proposes to do, it is clear to me that Zurich's decision was not arbitrary and capricious. Kovach's intentional choices, to drive a motorcycle, an inherently dangerous type of transportation, while intoxicated on a mixture of opiates and alcohol, and to drive through a stop sign, represented conduct that a reasonable person would have viewed as highly likely or substantially certain to result in an injury. Furthermore the Kovaches[6] should not be deemed to have reasonably subjectively expected that their disability insurance would cover such reckless behavior.

---

[6]Kovach's spouse purchased the insurance.

## 2.      *Zurich's reliance on case law*

Zurich also reasonably relied on federal case law in determining the meaning of "accidental."[7] This case law provided a reasonable basis for Zurich's denial of Kovach's claim and shows that Zurich's decision was not arbitrary and capricious. All but one of the many cases Zurich based its decision on dealt with injures to intoxicated motorists. Moreover, of those cases that dealt with an intoxicated motorist, all of them upheld a plan administrator's decision to define accidental as excluding occurrences involving driving with a BAC significantly over the legal limit. *See Nelson v. Sun Life Assurance Co. of Canada*, 962 F. Supp. 1010, 1012-13 (W.D. Mich. 1997) (BAC of .18); *Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775, 780-81 (E.D. Mich. 1997) (BAC of .22); *Miller v. Auto-Alliance International, Inc.*, 953 F. Supp. 172, 175-77 (E.D. Mich. 1997) (BAC of .29); *Cates v. Metro. Life Ins. Co.*, 14 F. Supp. 2d 1024, 1027 (E.D. Tenn. 1996) (BAC of .18); and *Fowler v. Metro. Life Ins. Co.*, 938 F. Supp. 476, 480 (W.D. Tenn. 1996) (BAC of .26). The majority focuses on the fact that the injured parties in these cases had a BAC that was higher, to varying degrees, than Kovach's in this case. However, this distinction ignores the fact that Kovach, like each of the comparable claimants, was driving illegally with a BAC well over the legislatively determined limit. It was this key similarity, when coupled with the reasoning from these cases, that Zurich relied on in deciding to deny coverage to Kovach. Furthermore, it was not arbitrary and capricious for Zurich to conclude that, in addition to his high BAC level, Kovach was also on opiates at the time of the collision. This factor enhanced Kovach's level of intoxication. As a result, the reasoning in each of these cases supports Zurich's decision to deny coverage.

---

[7]Because I would find that Zurich was not arbitrary and capricious in deciding that Kovach's injuries were not the result of an accident, I do not consider whether his injuries resulted from a self-inflicted wound.

### 3.    *Foreseeability of injury*

The majority criticizes Zurich for failing to provide information on the foreseeability of harm to Kovach based on his specific BAC, which was nearly double the legal limit.  However, in criticizing Zurich, the majority overlooks the more important point that Kovach did not contest that his high BAC and opiate use contributed to the traffic collision, or even the degree of his intoxication.  When Zurich based its decision on Kovach's level of intoxication, it was incumbent on Kovach to challenge their determination.  By failing to do so, Kovach essentially conceded that point.  Furthermore, since Kovach did not contest this point, Zurich had no reason to provide additional evidence or argument establishing how intoxicated Kovach was and the degree to which that contributed to his injury.

### 4.    *Ordinary meaning*

In an effort to discredit Zurich's interpretation of the term accidental, the majority provides an ordinary meaning of "accidental," but a closer examination of the ordinary or dictionary meaning of "accidental" does not reveal a single accepted understanding.  Instead, the ordinary meaning seems to establish that there is more than one meaning of the word "accidental," and that Zurich's interpretation, even if not the best, was certainly not an arbitrary and capricious interpretation.  The majority accepts the ordinary meaning of accidental to be "occurring unexpectedly or by chance" or "happening without intent or through carelessness and often with unfortunate results." Kovach's traffic collision was obviously unexpected in the sense that he clearly did not *actually* expect it would happen; if he did, then hopefully he never would have driven his motorcycle while intoxicated in the first place.  But, to a third party observer–an ordinary person–the fact that an intoxicated motorcyclist ran a stop sign, and that a collision occurred after an intoxicated motorcyclist ran a stop sign would both probably be expected, or at least sufficiently careless that unfortunate results would certainly not be unexpected.  Certainly an ordinary person would expect that, if one drives with a BAC well above the legal limit, he or she should expect that a traffic collision would be much more likely to occur, which is why there are laws against driving while

intoxicated. *See Michigan v. Sitz*, 496 U.S. 444, 451 (1990) (describing the well known dangers and costs of drunk driving).

Furthermore, to say that Kovach's traffic collision happened by chance, without intent, or through mere carelessness is to absolve Kovach of the responsibility the ordinary person would certainly feel he had for the traffic collision. By driving a motorcycle while intoxicated, Kovach engaged in more than merely careless behavior, he intentionally chose to engage in grossly negligent or reckless behavior. Indeed, the first definition of accidental listed in Webster's dictionary, which the majority omits, articulates the importance of assigning responsibility to Kovach's decisions:

> *1* : arising from extrinsic causes.

http://www.merriam-webster.com/dictionary/accidental. This primary definition captures the underlying sense of responsibility or, rather, the lack thereof that is ordinarily associated with the term accidental. Something accidental is something caused by external forces, or extrinsic causes, *not* something caused by personal decisions. But Kovach's injury was a result of his irresponsible choices, it was due to his misconduct, and it was his fault. The police report established that he ran a stop sign and the blood tests at the hospital showed that he was intoxicated. An ordinary person, asked who was to blame for Kovach's "accident," would certainly assign the fault and the responsibility to him and to his choices, not to extrinsic causes. In this case, his personal choices to drive while intoxicated and to drive his motorcycle through the stop sign caused the traffic collision, not the extrinsic or accidental causes (the other car, the pavement, the weather conditions, etc.). In any event, it was certainly not arbitrary and capricious for Zurich to follow this ordinary meaning, and to determine that Kovach's injuries were not caused by accidental means under the ordinary meaning or dictionary definition of the word.

### 5. *Other risky activities*

The majority hypothesizes that this court would not permit a plan administrator to find that injuries resulting from text messaging while driving, drowsiness while

driving, or driving after taking certain over-the-counter medications were not the result of an accident.  While I would wait for an actual case to determine what this court would find, I note that these examples are not analogous to Zurich's denial here because Kovach was engaged in illegal activity: he drove his motorcycle through a stop sign with a BAC nearly double the legal limit and while on opiates.  In contrast, while unwise, it would not have been illegal for Kovach to drive while text messaging, drowsy, or even on most over-the-counter medications.

### 6.  *Lack of a Specific Exclusion*

I agree that Zurich could have added a specific exclusion stating that injuries resulting from driving while intoxicated would not be considered accidental, and this would have obviated the need for this case.  However, plan language will never cover every conceivable situation, nor should it be expected to.  That is why plan administrators, like Zurich, are given discretion to determine the meaning of plan language in the first place.  Furthermore, while Zurich did include specific exceptions for "skydiving, parasailing, hangglinding [sic], bungee-jumping, or any similar activity," all of these activities are legal, unlike driving through a stop sign while intoxicated.

### D.    Conclusion

The majority adopts the *Wickman* standard and concludes that Zurich failed to apply it in this case.  If that were the case, then it seems that it would be appropriate to remand and allow Zurich to reconsider its decision in light of *Wickman*.  However, it is clear that, although not required to, Zurich already applied the *Wickman* standard to the facts of this case and that its decision to deny benefits was not arbitrary and capricious.  Consequently, I respectfully dissent from the majority's opinion and would affirm the district court's decision.