NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0941n.06

No. 14-3095

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Dec 22, 2014
DEBORAH S. HUNT, Clerk

DIANE TONGUETTE,

    Plaintiff-Appellant,

v.

SUN LIFE AND HEALTH INSURANCE
COMPANY (U.S.),

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
SOUTHERN DISTRICT OF
OHIO

Before: SUTTON and KETHLEDGE, Circuit Judges; ROSENTHAL, District Judge.[*]

KETHLEDGE, Circuit Judge. Del Tonguette died during a 91-day period in which, under the terms of an ERISA plan, he was entitled to convert his group life-insurance policy to an individual one. His widow, Diane Tonguette, thereafter requested payment of Del's life-insurance benefit. The plan's administrator, Sun Life—which is also the insurer that would pay the benefit—denied payment under its reading of the plan's terms. Diane later brought this lawsuit under ERISA, 29 U.S.C. § 1132(a), claiming that Sun Life's denial was contrary to the plan's terms. The district court granted summary judgment to Sun Life. We reverse.

Del Tonguette began work at LoBue Associates in August 2009. LoBue maintains an ERISA benefits plan administered by Sun Life. Under that plan, Del's benefits package included group life-insurance coverage in the amount of $95,000. Del left LoBue's employ on October

---

[*] The Honorable Lee H. Rosenthal, Judge for the Southern District of Texas, sitting by designation.

16, 2009, at which time, per the terms of the group policy, his coverage ended. But the plan gave Del the option to convert his group life-insurance policy to an individual one. As a general matter, under the plan, that option remains available only for 31 days. That period is extended to 91 days, however, if neither LoBue nor Sun Life provides a departing employee with notice of the option.

Del Tonguette neither received notice of his conversion option nor exercised it before he died. That Del did not receive notice of his conversion option means that his conversion period ran for the full 91 days, until January 15, 2010. But Del died six days before then, on January 9, 2010. His widow, Diane Tonguette (whom we refer to as "Tonguette"), thereafter requested payment of his death benefit under the group policy, citing a plan provision entitled "Death within the Conversion Period." The plan's administrator, Sun Life, read that provision differently and denied payment. The district court agreed with Sun Life's reading. Tonguette appealed.

LoBue's plan gives Sun Life discretion with respect to its determinations whether a plan participant is eligible for benefits. To the extent a plan administrator exercises such discretion in denying a claim for benefits, we uphold its decision so long as the decision is not arbitrary or capricious. *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 328 (6th Cir. 2009). But a plan administrator does not have discretion to adopt an interpretation of the plan contrary to its unambiguous terms. *Adams v. Anheuser-Busch Companies, Inc.*, 758 F.3d 743, 747–48 (6th Cir. 2014). And "[w]hether plan language is ambiguous is a legal question that we review *de novo*." *Id.* at 747. Finally, in determining whether plan language is ambiguous, "we apply federal common law rules of contractual interpretation[.]" *Perez v. AETNA Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (en banc).

The provision at the heart of the dispute here provides in full:

**Death within the Conversion Period**

Claim may be made for a death benefit if you die *during the 31 day period during which your insurance may be converted to an individual policy.* (See section "Conversion Privilege".)

The terms of this benefit are as follows:

1.  The amount of your Life Insurance that may be converted will be payable as a claim under the group policy. No Accidental Death and Dismemberment benefit, if any, will be paid under the terms of this section.

2.  This benefit will apply whether or not you have:

    a) applied for a conversion policy; or

    b) paid the first premium.

3.  If a conversion policy has been issued:

    a) it must be given back to the insurer; and

    b) no claim can be made under it other than for the return of premiums paid.

(Italicization added.)

Under this provision, if a plan participant dies within the period described by the italicized language, Sun Life will pay the participant's death benefit (in Del's case $95,000) under the group insurance policy. The dispute here concerns the length of the period described by the italicized language. Specifically, as the parties acknowledged at oral argument, the question presented is whether the italicized language refers to the length of the applicable conversion period under the plan (Tonguette's view), or instead refers only to the first 31 days following the termination of group coverage, even if the conversion period runs longer than 31 days (Sun Life's view).

The meaning of this language is straightforward in cases where the plan participant is given notice of the conversion option: under either Tonguette's view or Sun Life's, the italicized language refers to a single 31-day period that begins on the date the participant leaves the company. But—at least when considered in isolation—the italicized language becomes grammatically incoherent in cases where, as here, the conversion period extends beyond 31 days. The language refers to "*the* 31 day period during which your insurance may be converted to an individual policy." As used in this clause, "the" is a definite article, meaning there is only one 31-day period in which the participant can convert. In cases where the conversion period is more than 31 days, however, there is more than one 31-day period in which the participant can convert. For example, in a case where the period runs for 33 days, there are three such 31-day periods: one from days 1-31, a second from days 2-32, and a third from days 3-33. In Del's case, where the conversion period ran for 91 days, there were 61 different 31-day periods— starting as early as day 1 and as late as day 61—in which he could have converted. Thus, in these cases, the grammatical premise of the italicized language—that there is only *one* 31-day period in which the participant can convert—is absent.

The parties try to resolve this incoherency by, in effect, adding one word or subtracting two, respectively, from the italicized language. Sun Life would add a word, reading this language to mean "the *initial* 31 day period during which your insurance may be converted to an individual policy." Tonguette would subtract the words "31 day", reading the language to mean "the [] period during which your insurance may be converted to an individual policy."

Read in isolation, then, the italicized language appears ambiguous. This ambiguity recedes, however, when one looks at the language of the relevant "Part" of the plan as a whole. That language includes two indications as to how to resolve the incoherency here—and both of

them favor Tonguette's interpretation. The first is the provision's heading, which cannot be used to create ambiguity, but can be used to resolve it. *See, e.g., Int'l Multifoods Corp. v. Comm'l Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir. 2002). And here the provision's heading resolves the ambiguity cleanly, by making clear that the italicized language refers to, as the heading says, "death within the conversion period."

The second indication comes in a provision entitled "Notice of Conversion Period[,]" which provides in relevant part: "Written notice of the Conversion Privilege and its duration will be given to you at least 15 days before the end of *the 31 day period following termination of coverage under the Group Policy.*" (Emphasis added). This italicized language—which comes in the very next provision after the one at issue here—conveys exactly the same meaning that Sun Life tries to give to "the 31 day period during which your insurance may be converted to an individual policy" in the preceding provision. And that the two provisions use markedly different language, in such close proximity, is reason to read them differently. *See, e.g., Smith v. ABS Industries, Inc.*, 890 F.2d 841, 846 (6th Cir. 1989).

One might respond that Tonguette's reading of the plan allows her to obtain a death benefit even though Del paid no premiums for almost three months after his group coverage terminated, rather than just one month. But that is an equitable point, not a textual one; and even taken on its own terms, the equities of that point are offset by the greater dereliction of failing to provide notice of the conversion option for three months, rather than just one. That dereliction is significant in part because a person losing his insurance could easily overlook that his policy—which he might have bought years earlier—even includes a conversion option.

In summary, when read in the broader context of the plan, there are two significant reasons to favor Tonguette's reading of the disputed language, and none to favor Sun Life's.

Moreover, there is a difference between vague terms—whose vagueness might give rise to discretion—and poorly drafted terms that, after a careful reading, demonstrably favor one interpretation over another. Here, a careful reading of the plan's terms reveals that Tonguette's interpretation is demonstrably better than Sun Life's. As a plan fiduciary, Sun Life was obligated to read the plan carefully; and it lacked discretion to reject Tonguette's interpretation of the disputed language here. Its interpretation therefore was arbitrary and capricious.

The district court's judgment is reversed, and the case remanded for proceedings consistent with this opinion.

SUTTON, Circuit Judge, dissenting. Sun Life and Tonguette share some common ground in this case. They agree that Sun Life has interpretive authority over this group life insurance plan, meaning that the courts will accept its interpretation so long as it is not arbitrary and capricious. They agree that there is some facial ambiguity over whether the "death benefit" provided by the life insurance plan applies only to a death that occurs within 31 days after separation from the company or extends to a death that occurs up to 91 days after separation if the employer or Sun Life fails to give written notice of the option to convert the group policy to an individual policy. And they seem to agree that the search for meaning does not end merely because a first reading of the relevant provisions suggests facial ambiguity.

In attempting to resolve this ambiguity, Tonguette focuses on the fault of Sun Life and the employer in failing to give notice of the conversion option during the initial 31-day period and the plan's provision for a 60-day extension of the conversion period when no notice is given. So long as the employer and Sun Life give notice of the conversion option within 15 days of an employee's separation from the company in the future, Tonguette points out, the death benefit will apply only to deaths that occur within 31 days of a departure from the company. The insurance company in short holds the key to any undue consequences caused by this interpretation and next time around can simply turn the key—give notice—and avoid this problem.

Tonguette's reading, it seems to me, overstates the value of imposing the risk of a lack of notice on the insurance company/employer and understates the nature of the death benefit. To my mind, it is helpful to think about the relevant provisions as creating two things: (1) a death benefit that is given no matter what happens and is free because it does not require a conversion of the policy or the payment of any premiums (and indeed requires the return of any premiums

paid) and (2) a life insurance conversion option (not unlike a COBRA medical insurance conversion option) that contains a conversion period of at least 31 days and as many as 91 days if no written notice of the conversion option is given.

Once we separate these two concepts, an uncomfortable reality of Tonguette's interpretation emerges. It reads "the 31 day" out of existence. Recall the language of the key sentence: "Claim may be made for a death benefit if you die during the 31 day period during which your insurance may be converted to an individual policy." Under Tonguette's reading, the key phrase ("the 31 day") does no work, an interpretive consequence we try to avoid where possible. *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014). Part 6 of Del's policy, which contains all of the provisions at issue here, mentions a 31-day time period six times. The other five references concern the 31 days immediately following the date the policy terminates: the date of separation from the company. It would not seem to be arbitrary to use that meaning here.

Nor is it obvious how best to account for the incentives of the parties in this setting. Best I can tell, the employer has no skin in the game from a monetary perspective. Leaving the death benefit window at 31 days or extending it to up 91 days would not affect the employer one way or the other, as the insurance company pays the claim. Nor does it seem that Sun Life would have any incentive to delay notifying a former employee of his conversion rights. The company *always* has an incentive to provide notice: money. When an insured converts a lapsed group policy into an individual policy, Sun Life collects a stream of new premium payments. Think of notice of a conversion right as the most promising form of advertising an insurance company ever provides. Any other approach to the issue assumes that Sun Life has a most unorthodox business plan for an insurance company.

No doubt, Tonguette's widow suffered if the couple did not know about the conversion option and if they would have converted the policy to an individual policy had they been told of the option before he unexpectedly died. But even this perspective requires qualification. The Tonguettes were not fault free. The employee handbook warns employees that all individual coverage "terminates . . . when you leave your employment." R. 31-1 at 24. And it warns employees that "[i]f you cease active work, see your supervisor to determine what arrangements, if any, may be made to continue your coverage beyond the date you cease active work." *Id.* The record confirms only that Del Tonguette did not receive "written notice" of the conversion option—the triggering event for extending the conversion option window—not that he did not have actual notice of the option.

Even if we assume Del Tonguette had no notice, whether actual or written, of the conversion option, consider what Tonguette's reading of the plan means in other settings. Consider for example how this would play out for an employee who had actual notice of the option, hardly an unusual scenario for a responsible employee who voluntarily leaves a company, but no "written notice" of the option. He or she could do one of two things: (1) convert immediately and still receive a three-month free death benefit or (2) wait to convert until day 91 but be covered before then anyway. As interpretive consequences go, neither one of these possibilities seems like a probable way of capturing the point of this "death benefit." Adding to my doubts on this score is the reality that the provision says the death benefit will apply "whether or not you have . . . paid the first premium." As shown, more than one premium could be paid in a 91-day window in this scenario. As I see it and as I think Sun Life could see it without being arbitrary and capricious, the policy provides a 31-day free death benefit (no questions asked, no premiums needed, no conversion needed) and a 91-day window to convert

(if the employer or Sun Life fails to give written notice of the conversion option).  The majority

seeing things differently, I respectfully dissent.