BOGGS, Circuit Judge,
dissenting.
The provision of the Accidental Death or Dismemberment Insurance policy (the *254 “Plan”) relevant here provides that benefits will be paid for accidental “loss of foot,” which “means the permanent and total loss of function of the !.. foot as'a result of an accident after the loss has continued for at least 12 consecutive months.”" This provisión requires three things: (1) a permanent loss of the function of the foot'; (2) a loss that is total; and (3) a loss that has continued for twelve months. By" the plain language of the policy, each requirement is indépendent.
In the ordinary, case, a severe injury can be seen to cause a total and permanent loss .of function, and payments will, begin as soon as the twelve-month period expires. However, it is quite plausible for a loss of function to be total for a while but then be subject to some improvement, even if that improvement takes more than twelve months to manifest. That is what happened here. Stockman’s foot was badly injured. He lost all function for a while but was expected to improve. That improvement took more than twelve months but, there is no doubt that it occurred. Stockman can now use his foot to get around, ambulate with a cane or, with a limp at times, and bear some weight-as his doctor expected. He does not have “noi'-mal” function of his foot, and never will— but he is able to use his foot to a reasonable extent and thus his permanent loss of function is far from total. He is therefore not entitled to dismemberment benefits. If he wanted a disability policy, he could have bought one. He did not.
The majority at some points reads the Plan as though it says “total loss of function for at least twelve months,” even if not permanent. See Maj. Op. at 253. It doesn’t. At other points, the majority reads the Plan as if it says “permanent loss of normal function.” See id. at 246, 252-53. It doesn’t. I therefore respectfully dissent.
I
In order to establish the proper context, I offer a brief recitation of the factual background of Stockman’s claim.
A
On October 19, 2009, Stockman fell from a ladder while changing a light bulb and shattered his left calcaneus, or heel bone. The. office notes of Stockman’s surgeon, Dr. Barnett, from less than a month after the accident explain that Stockman “has been nonweightbearing on his left side, but has had a shooting pain all throughout his heel, especially with weightbearing.” Records from January 7, 2010, state that, while Stockman had remained nonweight-bearing to that point, “[h]e will be allowed to begin weightbearing in one weeks [sic] time.” Dr. Barnett also opined that Stock-man’s “pain will go down once he bears more weight on his left side.” However, due to a continuing infection in the wound and multiple irrigation and debridement procedures, Stockman remained non-weightbearing for several months.
In a follow-up visit on June 22, 2010, Dr. Barnett noted that Stockman’s wound was still “nonhealing,” but had “dramatically improved.” At this time, Stockman “had been nonweightbearing using a wheeled knee walker,” and, though his pain was “well tolerated,” it became “worse with attempts at weightbearing.” On October 12, 2010, nearly a year following the accident, Stockman’s wound was “doing great,” but he was still not putting any weight on his foot and was using a wheeled knee walker. Stockman’s “refus[al] to bear weight” at this point made Dr. Barnett “concerned.”
In November 2010, Stockman reported “a great deal of difficulty walking on his foot” and pain that was “worse with *255 weightbearing.” Dr. Barnett observed “no obvious significant other issues besides swelling when [Stockman] has been ambulating for quite awhile [sic].” During this visit, Stockman again “refuse[d] to bear weight” on his foot. Significantly, in his report, Dr. Barnett stressed that:
I believe [Stockman] needs to get out and do as much as he can on his foot to try and get weight back on there. I offered him physical therapy and he accepted. He will go ... [to] physical therapy and have them work with him on getting his range of motion, strength and gait going again. I believe all of the time that he had off has really restricted him. I believe if he gets out and starts putting weight on this that the bone should start to feel better. I know he is very scared to do so and I believe the therapist will help him____ However, he knows that he will never have a normal foot again and may end up with chronic disability from this injury but he is very happy that he still has his foot and he was thankful to me for saving his [foot] for him.
(emphases added).
Several months later in May 2011, Dr. Barnett noted that Stockman was “putting full weight” on his foot and came into his office “walking today without any assistive devices,” though with a “mild antalgic gait on his left side.” At this time, Stockman was not taking any narcotic pain medications. Dr. Barnett’s final records from August 30, 2011, indicate that Stockman complained of “constant pain that is unbearable,” and that Stockman’s condition was aggravated by weightbearing and relieved by elevation. However, Dr. Barnett’s assessment notes that Stockman’s weightbearing status was “full,” that Stockman was issued a cane to help with walking, and that Dr. Barnett would “try [physical therapy] for now” as the recommended treatment plan.
B
In a sworn statement given on September 27, 2011, Dr. Barnett noted that it was not “typical” for patients suffering from a fractured calcaneus to be nonweightbear-ing for such a long period. According to Dr. Barnett, such patients typically “begin weight bearing approximately eight to ten weeks after their [surgery]” and “ge[t] back to as normal function' as they can within a couple' of' months.” Stockman, however, did not heal in the typical time-frame and “was unable to get back to full weight bearing' during” the first half of 2010 “due to the infections and the multiple surgeries which he needed.”
Dr. Barnett reiterated his “opinion that [Stockman] will never have a normal foot,” explaining that Stockman “can expect.to have some functional impairment as time goes on.” (emphases added). Dr. Barnett agreed that Stockman has not made “a total recovery” and has not- “regained 50 percent of the capacity that he had”, prior to the accident. Stockman was not expected to improve much going forward; however,, as of August 30, 2011, Stockman had “gained.some mild use of his foot to the point where he was able to walk with an antalgic gait [that is, a limp] into [Dr. Barnett’s] office without any assistive devices.” Dr. Barnett expected that Stock-man “for the rest of his life will require, at times, the use of a cane for brief periods, maybe he will not use anything at all but I do-not anticipate him doing this for long periods of time.”
Regarding the relevant language of the Plan, Dr. Barnett agreed that the “destruction of [Stockman’s] calcaneus” was “permanent” due to “loss of the bony tissue which can never recover or be rebuilt.” Regarding functionality, Dr. Barnett de *256 fined “the function of a foot” as being “mainly used for propulsion,, for locomotion, ... to get around.” When addressing the Plan’s requirement of “a total loss of function,” Dr. Barnett stated that he would consider Stockman’s condition to be “a loss of normal function.” (emphasis added). Dr. Barnett. also confirmed that Stockman was under care for his condition “for at least , 12 consecutive months” and identified Stockman’s condition as “chronic,” in that it “is expected to be with the patient permanently.” Regarding Stock-man’s future, Dr. Barnett opined that he “has a relatively poor prognosis” and “will have difficulty, walking [around] the mall and doing shopping” and will “likely need an assistive device of some kind such as a cane.” When asked about Stockman’s weightbearing and whether his foot is “useful or beneficial' to him,” Dr. Barnett stated that Stockman was not going 'to have the capabilities of “jumping, running, [or] normal locomotion without a limp ... going forward.” Howéver, Dr. Barnett stressed that “it’s incredibly useful and incredibly'benéfícial to still have your foot on your body,” and that Stockman “can still use [his foot] to get around.” (emphasis added).
MetLife’s expert, Dr. Del Valle, determined “[w]ithin a reasonable degree of medical certainty” that Stockman’s injury “resulted in permanent loss of normal function of his foot. ' He however has somé functionality of the left foot in that he can weight bear [sic] with limitations and can walk with [a] cane. He thus has some functionality of his left foot, and thus it is not [a] total loss of function.” (emphasis added). Regarding Dr. Barnett’s conclusions, Dr. Del Valle observed that “UJoss of normal function as noted by Dr. Barnett is not equivalent to total loss of function.” (emphasis added). The. “[fjunc-tionality of [Stockman’s] left foot is significantly limited,” but he does not suffer from a “total loss of function or [else] he would be unable to bear weight and ambulate with or without assistive devices.”
Dr. Del Valle did conclude that in the twelve-month period immediately following the accident, Stockman had a “total loss of function of his left foot as he was instruct-. ed to be non.weight bearing [sic].” However, Stockman’s “functionality improved” following the surgical procedures and healing “more than 12 months after the accident.” Because Stockman’s ability to bear weight and ability for locomotion returned, “his [total] loss proved to not ,. be permanent.”
II
When interpreting the language of an ERISA plan, this court will apply the plain meaning of the plan’s lánguage to give effect to its unambiguous terms. Farhner v. United Transp. Union Discipline Income Prot. Program, 645 F.Sd 338, 343 (6th Cir.2011). Plain meafiing refers to the language as it would be understood by an ordinary person. Kovach v. Zurich Am. Ins. Co., 587 F.3d 323, 332 (6th Cir.2009). While any ambiguities in the plan’s language should be construed against the insurér, we must “not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy.” Evans v. Safeco Life Ins. Co., 91,6 F.2d 1437, 1441 (9th Cir.1990).
m
The Plan under which Stockman claimed benefits includes an Accidental Death or Dismemberment Insurance policy, which, unsurprisingly, “pays benefits in case of an accidental death or dismemberment:” The applicable policy is thus explicitly a- dis *257 memberment policy, and not a disability plan. Included under the relevant provision for “dismemberment benefits” is coverage for “loss of foot,” which “means the ... foot is severed at or above the ... anide joint, or means the permanent and total loss of function of the . foot as a result of an accident after the loss has continued for at least 12 consecutive months.”. There is no dispute that Stock-man’s foot was not severed; thus, he can only be eligible under the “loss of function” portion of the Plan.
According to MetLife, the plain language of this provision- requires that Stockman’s loss of function be i) permanent; and ii) total; and iii) one that has continued for at least twelve consecutive months. I agree. Thus, a beneficiary can suffer from a severe injury that is nonetheless ineligible for dismemberment benefits because the resulting loss of function is total but not permanently so; or is permanent but not total; or is both total and permanent but has- not yet been present for twelve consecutive months following the causal accident.
A
The central point of contention regarding the proposed interpretations of the Plan offered by Stockman, MetLife, and the majority opinion involves the interaction between the terms “permanent” and “continued for at least 12 consecutive months.” The " majority determines that the word “permanent” renders the- Plan ambiguous “in light of the other provisions of the policy.” Maj. Op. at 252. Apparently, in the majority’s view, interpreting the world “permanent” according to its plain meaning would conflict with the twelve-conseeutive-months language and “create an insurmountable requirement, to claim benefits.”- Id. at 253. This is not so. Under the most plausible understanding of the Plan based on its plain terms, each of the Plan’s requirements — i.e., that the loss of function be total, permanent, and one that has continued for at least twelve consecutive months — operates quite comfortably alongside one another.[1].
All parties seem to agree that function in this context refers to using a foot for weightbearing and ambulation, or “to get around.” See id. at 246. Thus, a total loss of function would be characterized by an “absolute” .or “utter” loss of the ability to bear weight and get around using the injured foot.. Webster’s Third New International Dictionary 2414 (1986) (defining “total” as “unqualified in extent or degree; absolute; utter”). And such a loss would be permanent if-it were “continuing or enduring ... without - fundamental, or marked change” and “not subject to fluctuation or alteration.” Id. at 1683 (defining “permanent”).[2]
*258 The twelve-month time frame serves as a waiting period during which a beneficiary cannot receive benefits even if he alleges that he suffered a total and permanent loss. It reflects a determination that any final assessment of the. extent- and nature of a loss of function not be made for at least one year, providing confidence that the assessment is made to a reasonable degree of medical certainty and.is based on sufficient evidence. The Plan’s use .of the phrasing “after the loss has continued for at least 12 consecutive months” supports the understanding that the twelvemonth language describes a.separate .evidentiary requirement, rather than modifies the definition of “loss” in the same way as do the terms “permanent” and “total.” In this way, the twelve-month requirement does not undermine or cabin the' Plan’s requirement that a covered loss be “permanent,” but in fact operates comfortably alongside it. Adopting this interpretation would therefore best fulfill our duty to “give effect to the unambiguous terms of an ERISA plan.” Lake v. Metro Life Ins. Co., 73 F.3d 1372, 1379 (6th Cir.1996). In the majority’s reading, by 'contrast, total loss for thirteen months would result in eligibility for benefits even if all-agreed that the injured foot would become wholly normal in the fourteenth month and -it in fact becomes so. That is not a plausible reading of the Plan.
The majority disclaims any intent “to read the term ‘permanent’ in a way that would render it superfluous.” Maj. Op. at 253. Yet, even in framing the question presented by- Stockman’s appeal, the majority asks: “Does a ‘total loss’ become ‘permanent’ for purposes of triggering the Plan’s coverage upon lasting for twelve consecutive months after an injury, or must an injury be both total and permanent to trigger coverage under the Plan ... ?” Id. -at 251. Even though the Plan flatly requires a “permanent and total loss of function,” the majority ultimately opts for- the former" interpretation over the latter. If defining' the term “permanent” to mean “lasting for twelve consecutive months” does not render that term superfluous, I am not sure what would — the provision would read the same whether or not the word “permanent” appeared. Cf. id. at 252 .(recognizing dictionary definition of permanent, as “continuing or enduring without fundamental or marked change”). Indeed, the majority goes on to hold that Stockman is qualified to receive benefits because “[i]t is undisputed that Stockman had a total- loss of the function of his foot for .at least twelve months, consecutively.” Id. at 253. By this point, “permanent” has disappeared entirely from the majority’s analysis.
The majority’s interpretation essentially converts the Plan’s definition of loss into “a total loss óf thé function of [the] foot for at least twelve months,” ibid., whether or not' the loss is permanent — i.e., continuing or enduring without fundamental or marked change. This is not what the Plan says, and this, court should not alter the terms of an ERISA plap .because of sup *259 posed ambiguity when a perfectly sensible interpretation based on the plan’s plain language exists. See Adams v. Anheuser-Busch Cos., 758 F.3d 748, 748-49 (6th Cir.2014) (determining that an ERISA plan had “only one plausible interpretation” when the relevant “provision is understood according to its ordinary, meaning, and no term is ignored” or “rendered superfluous”).
B
Under the proper understanding of the Plan based on its plain terms, it is clear that Stockman’s injury, which certainly did “continu[e] for at least 12.= consecutive months” following the accident, did not result in a permanent and total loss of function. The administrative record demonstrates that Stockman suffered both a total loss of function that was temporary (and thus not permanent), and thereafter a permanent loss of some function (and thus not total), but not a total and permanent loss of function as the Plan requires.
MetLife’s own expert agreed that for the twelve-month period following the accident, Stockman had a “total loss of function of his left foot,” as he was instructed to remain completely nonweightbearing because of significant pain exacerbated by attempts at ambulation. In the district court and the majority’s view, this ended the matter: If MetLife were able to rely on Stockman’s improved functionality “more than 12 months after the accident” to conclude that Stockman’s “loss proved to not ... be permanent,” MetLife could “point to any minimal improvement, after twelve consecutive months and. eligibility has been established, as a basis for denying eligibility.” Maj. Op. at 250. Not so.
It would be problematic for an insurer to deny benefits based on some mild improvement that left little or no function in the foot, but that is not the situation here. The real issue is not that there was some “minimal improvement” in Stockman’s condition, but rather that his condition. was expected to improve enough — as . it ultimately did — that; based on reasoned medical judgment, Stockman . never, suffered from a total loss of function that is permanent, .given that he can now use his foot to get around, ambulate with a cane, and bear, some weight as his doctor anticipated. Put differently, the .record lacks any expressed expectation. from the relevant time period that,Stockman’s total loss of function — demonstrated by the “absolute” or “utter” inability to..bear weight and ambulate — would continue “without fundamental or marked change.”
Dr.' Barnett’s records from January 2010, less than three months after the accident,' indicate his expectation that Stockman would “be allowed to begin weightbearing in one weeks [sic] time.” This corresponds with Dr. Barnett’s observation that individuals suffering from a fractured calcaneus typically “begin weight bearing approximately eight to ten weeks' after their [surgery]” and “ge[t] back tó as normal function as they can within á couple of months”’ Unquestionably, Stockman did not heal within the normal timeframe “due to the infections and thfe multiple surgeries which hé needed.” But there was no indication that these setbacks would constitute more than a temporary delay, albeit a significant one, in Stockman’s ability to regain some function, which would render any permanent loss of function less than total. Indeed, by November 2010, Dr. Barnett recommended that Stockman “do as much as-he can on his foot to try and get weight back on there,” and believed that if Stockman “gets out and starts putting weight on this [then] the bone should start, to feel better.” It seems unlikely that a physician would make such a recommendation to a *260 patient permanently suffering from the inability to bear weight and ambulate.
Stockman argues that his loss is permanent by stressing that he has suffered a “loss of the bony tisá'ue”- and “supporting structure” of his foot that “can never recover-orbe rebuilt in any way.” Appellee Br. 31. The majority in effect adopts this argument, observing that “ ‘the destruction of [Stockman’s] calcaneus [heel] is permanent’ because, ‘from an orthopedic standpoint,’ Stockman ‘has loss of the bony tissue which can never' recover or be rebuilt in any way.’ ” Maj. Op. at 252. This demonstrated only that Stockman suffers from á physical injury that is permanent. But, of course, that is not the relevant inquiry. We are concerned here with whether the loss of junction associated with that injury is permanent (and total). Compare id. at 244 (noting the Plan’s requirement of a “permanent and total loss of junction of the ... foot”), with id. at 251 (framing the question , as whether “an injury [must] be both total and permanent to trigger coverage under the Plan”), and id, at 246 ,(“[T]he, destruction of Stockman’s left heel bone was ‘permanent.’”) (emphases added). Indeed, at no point does the majority hold that Stockman’s total loss of function is permanent as the Plan requires, nor could it, Cf. id. at 244 (Stockman “lost the use of his left foot for one year. A series ,of surgeries partially restored Stockman’s use of the foot, but it remains permanently damaged.”); id. at 253 (“Stockman has not regained full use of his foot.”) (emphases added).
I do not foreclose the possibility that an individual could, under some circumstances,. suffer. a permanent, total loss of function resulting -from an injury that would typically be expected to involve a recovery of function. However, that is not the case here.
C
Dr. Barnett’s statements that Stockman will not have the “capabilities” of “jumping, running, [or] normal locomotion without a limp ... going forward,” “can expect to have some functional impairment as time goes on,” “will have difficulty walking [around] the mall and doing shopping,” and will “likely need an assistive device of some kind such as a cane” do not undermine' this analysis. Rather, they are consistent with Dr. Barnett’s conclusion, which is supported by MetLife’s expert, that Stockman has suffered “a loss of normal function.” But that is not sufficient to meet the Plan’s requirement of a total loss of function.'
The majority’s observation that “for all intents and purposes,” Stockman’s foot “no longer serves the purpose it was intended to serve and will never be able to serve that purpose again,” id. at 253, is contradicted by the administrative record and Dr. Barnett’s own statement that Stock-man “can still me [his foot] to get around.” See id. at 246 (noting'Dr'. Barnett’s opinion that Stockman can “still use [his foot]”). As Dr. Barnett expected from the beginning, Stockman retains some function in his injured foot. See id. at 244 (“A series of surgeries partially restored Stockman’s use of the'foot____”)'.[3] Stock-man observes that'his ability to stand and ambulate using his injured foot is “permanently limited,” and that the functionality of his foot is “significantly limited” as a result. Appellee Br. 19, 21. However, permanent and significant loss of function *261 is not permanent and total loss of function, which would be characterized by the “absolute” or “utter” loss of the ability to bear weight and get around,
The majority gets around this fact by once again accepting Stockman’s invitation to alter the language of the Plan, converting the definition of loss into total and permanent[4] loss of normal function. See Maj. Op. at 253 (extending coverage where the claimant “will never regain normal use of his foot again”); id. at 246 (“Dr. Barnett asserted that Stockman’s loss of normal function had been continuous for at least 12 consecutive months____”); Appellee Br. 35 (stressing Stockman’s “loss of normal function permanently”) (emphases added). That is not our proper role.[5]
IV
I do not doubt the significant pain and suffering that Stockman’s injury has caused and continues to cause him, nor the drastic impact that the: injury has had upon his life. Nevertheless,' the record establishes that, as his doctor expected, Stockman retains sortie ability to usé his foot to bear weight and “get around,” which is the ordinary understanding of the function of a foot. Thus, for the purposes of dismemberment-insurance benefits under the Plan,' Stockman has not suffered a permanent and total loss of function. Stockman’s injury certainly constitutes a significant disability, and some wording in a disability policy might support compensation. However, the requirement in Stockman’s dismemberment policy that he suffer from a “loss of foot” is not met. I respectfully dissent.

. The majority asserts that the Plan is ambiguous because it “is susceptible to two reasonable interpretations.” Maj. Op. at 252, Any interpretation of the Plan that reads out or significantly undermines the Plan’s express requirement that the loss of function be permanent, however, should not be considered reasonable so long as a sensiblednterpretation that gives meaning to each of the Plan’s terms exists. See Adams v. Anheuser-Busch Cos., 758 F.3d 743, 748 (6th Cir.2014) ("The mere fact that parties propose competing interpretations of language in a[n ERISA] Plan 'does not dictate a finding that the provision is ambiguous.’ Rather, 'the alternative interpretation ... must be a plausible one.’ ” (omission in original) (quoting Shelby Cty. Health Care Corp. v. Majestic Star Casino, LLC Grp. Health Benefit Plan, 581 F.3d 355, 370 (6th Cir.2009))); Marquette Gen. Hosp. v. Goodman Forest Indus.; 315 F.3d 629, 632 n. 1 (6th Cir.2003) (‘.‘Disagreement between the parties as to an interpretation of the language does not-create ambiguity in-the legal sense.”).

. Stockman criticizes such an understanding of the term "permanent” as necessitating an • "essentially ... - unknowable”- 'determination *258 that a loss of function will "last indefinitely without change.” Appellee Br.-38. It is of course true that a beneficiary cannot demonstrate to an absolute degree of certainty that a loss of function — or anything else for that matter — will last forever, but-.this-is not. what the Plan requires. Rather, as is necessary in determining whether a loss is "total” or "has continued for at least 12 consecutive months,” thé permanence inquiry requires the exercise of reasoned judgment based on medical evidence. The use of such a “medical or technical perspective,” id. at 36, does not undermine tire plain meaning of the Plan’s language, but rather simply reflects that medical evidence is important and in- ■ deed necessary in determining-whether a beneficiary qualifies for dismemberment benefits, as Stockman’s own reliance-on medical records and expert testimony demonstrates.

. Indeed, Stockman's pwn narrative statement submitted to MetLife in October 2011 expressed that he’had'“wo use of'[his] left foot” between "October 20, 2009 and October 20, 2010,” which is the twelve-month period following the accident, but as of October 2011 "dd[es] not have full use of this foot.”

. See supra Part III.A.